**No. 26-2295**

**In the United States Court of Appeals**
**for the Fourth Circuit**

THE PEOPLE OF THE STATE OF CALIFORNIA,
*ex rel.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA

*Plaintiff-Appellant*,

v.

3M COMPANY, et al.

*Defendant-Appellee.*

IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCT LIABILITY LITIGATION

On Appeal from the United States District Court for the District of South Carolina
(Richard M. Gergel, District Judge)

# EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL AND SUMMARY REVERSAL

Nicholas G. Campins (SBN 238022)
Dije Ndreu (SBN 251278)
Brendan Hughes (SBN 333690)
Deputy Attorneys General
Jeremy Brown (SBN 269159)
Supervising Deputy Attorney General
Deborah M. Smith (SBN 208960)
Senior Assistant Attorney General

*Fourth Circuit Court Admissions forthcoming*

Stephanie D. Biehl
Ashley B. Campbell
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
(628) 231-2500
stephanie@sheredling.com
ashley@sheredling.com

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

BACKGROUND ..... 4

I. Dupont Defendants' PFAS Contamination Harms California's Public Health and Natural Resources. ..... 5

II. The DuPont Defendants' Ongoing Fraudulent Transfer Scheme. ..... 6

PROCEDURAL BACKGROUND ..... 8

JURISDICTION ..... 9

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 11

I. This Court Should Grant an Injunction Pending Appeal to Preserve the Status Quo. ..... 11

A. California is Likely to Succeed on the Merits. ..... 13

1. The Court Manifestly Erred in Denying Critical and Time-Sensitive Injunctive Relief by Refusing Leave to File the Proposed Motion. ..... 13

2. California is Likely to Prevail on Its Claims, Which Vest It With an Equitable Interest in the Assets It Seeks to Freeze. ..... 15

B. California Will Suffer Irreparable Harm if the Injunction is Denied, and an Asset-Freezing Injunction Serves a Significant Public Interest. ..... 20

C. The Equities Favor the People. ..... 21

D. Moving for an Injunction Pending Appeal in the District Court in the First Instance Would be Impracticable. ..... 22

II. The Denial of Leave Should Be Summarily Reversed. ..... 22

CONCLUSION ..... 23

CERTIFICATE OF COMPLIANCE ..... 25

CERTIFICATE OF SERVICE ..... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ........................................10

*Alward v. Rokosky*,
2025 WL 1794425 (4th Cir. 2025)........................................11

*Cnty. of Los Angeles v. Monsanto Co.*,
2019 WL 13064885 (C.D. Cal. Nov. 21, 2019)........................................16

*DiFederico v. Marriott Int'l, Inc.*,
714 F.3d 796 (4th Cir. 2013)........................................14

*FTC. v. Food Town Stores, Inc.*,
539 F.2d 1339 (4th Cir. 1976)........................................21

*FTC v. Warner Comms. Inc.*,
742 F.2d 1156 (9th Cir. 1984)........................................21

*FTC v. Weyerhaeuser Co.*,
665 F.2d 1072 (D.C. Cir. 1981) ........................................21

*Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*,
710 F.3d 527 (4th Cir. 2013)........................................10

*In re Aqueous Film-Forming Foams Prods. Liability Litig.*,
69 F.4th 436 (4th Cir. 2026)........................................ 9, 10, 13

*In re Delta Dental Antitrust Litig.*,
509 F. Supp. 3d 1377 (JPML 2020)........................................13

*In re Fox Ortega Enters.*,
631 B.R. 425 (Bankr. N.D. Cal. 2021)........................................ 18, 19

*Tang v. Synutra Int'l, Inc.*,
656 F.3d 242 (4th Cir. 2011)........................................14

*Long v. Robinson*,
432 F.2d 977 (4th Cir. 1970)........................................11

*Maldini v. Marriott Int'l, Inc.*,
140 F.4th 123 (4th Cir. 2025)........................................ 13, 14

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................. 10, 11

*People ex rel. Gallo v. Acuna*,
929 P.2d 596 (Cal. 1997) ..........................................................................15

*People v. ConAgra Grocery Prods. Co.*,
227 Cal. Rptr. 3d 449 (Ct. App. 2017)........................................................ 15, 16

*Pioneer Hi-Bred Int'l, Inc. v. AltEn, LLC*,
2023 WL 1822724 (D. Neb. Feb. 8, 2023) ..................................................20

*Potter v. Alliance United Ins. Co.*,
250 Cal. Rptr. 3d 282 (Cal. Ct. App. 2019) ..................................................12

*State ex rel. Stein v. E. I. du Pont de Nemours & Co.*,
879 S.E.2d 537 (N.C. 2022) ........................................................................17

*Strickland v. Moritz*,
149 F.4th 378 (4th Cir. 2025)............................................................ 11, 13, 22

*Turner v. United States*,
736 F.3d 274 (4th Cir. 2013)........................................................................10

*U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*,
889 F.2d 1327 (4th Cir. 1989)......................................................................22

*United States v. Oncology Assocs.*,
198 F.3d 489 (4th Cir. 1999)............................................................ 11, 15, 20, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................11

**Statutes**

28 U.S.C. § 1292(a) ..................................................................................9, 10

Cal. Civ. Code § 3439.04(a) ............................................................................12

Cal. Civ. Code § 3439.04(a)(2).........................................................................17

Cal. Civ. Code § 3439.04(a)(2)(B) ....................................................................18

Cal. Civ. Code § 3439.04(b)(4) ........................................................................19

Cal. Civ. Code § 3439.04(b)(7) ........................................................................19

Cal. Civ. Code § 3439.04(b)(8)–(9)...................................................................19

Cal. Civ. Code § 3479.......................................................................................15

**Rules**

Fed. R. App. P. 8 ....................10
Fed. R. App. P. 8(a)(2) ....................11
Fed. R. App. P. 8(a)(2)(A)(i) ....................22
Fed. R. App. P. 27(d)(2) ....................25
Fed. R. App. P. 32(a)(5) and (6) ....................25

## INTRODUCTION

The People of the State of California, by and through Attorney General Rob Bonta ("People" or "California"), move on an emergency basis for (1) an injunction pending appeal, and (2) summary reversal of a district court order denying leave to file a motion for a temporary restraining order and preliminary injunction ("Proposed Motion").[1] Immediate appellate intervention is required because the district court simply declined to engage with the substance of a motion by California, supported by 20 sovereigns of all political stripes and an array of other governmental bodies, seeking to protect the People's (and thousands of other plaintiffs') ability to recover on claims for environmental, public health, and other significant harms.

Unless this Court intercedes, Defendants will, on October 1, 2026, consummate a fraudulent corporate transaction—a culminating step in a long-running scheme to evade their known liabilities—that will further enrich their shareholders at the expense of the injured public. This Court must ensure that California has an opportunity to be heard in contesting that transaction before it concludes, an opportunity the court below inexplicably rejected.

This case is one of many coordinated in multidistrict litigation proceedings in the District of South Carolina. *See generally In re: Aqueous Film-Forming Foams*

---

[1] *See* attached Exhibit 2 ("Ex_2") (motion for leave); Ex_3 (Proposed Motion); Ex_4 (Memorandum in Support).

*Prod. Liab. Litig.*, No. 2:18-mn-2873 (D.S.C.) (the "MDL"); *California ex rel. Bonta v. 3M Co. et al.*, 2:23-cv-01531 (D.S.C.). Relevant here, the People allege that entities associated with E.I. du Pont de Nemours and Company ("Old DuPont" and collectively "DuPont Defendants")[2] are liable for at least tens of billions of dollars in public health and environmental harms caused by the manufacture and use of per- and polyfluoroalkyl substances ("PFAS"), known as "forever chemicals."

Aware of those and other liabilities, the DuPont Defendants have for years schemed to fraudulently transfer and dissipate their assets. Old DuPont's parent holding company, Corteva, Inc.,[3] which holds Old DuPont's historic PFAS liabilities, plans to imminently execute a further step in that scheme: On October 1, 2026, Corteva will divest its highly profitable Seed business—worth $22 billion in assets and $17 billion in net value—and "spin" it into a new company, Vylor Inc. ("Vylor Spinoff"). In so doing, Corteva will intentionally isolate Old DuPont's massive PFAS liabilities and its declining Crop Protection business in an

---

[2] "DuPont Defendants" refers to defendants Old DuPont, Corteva, Inc., the Chemours Company, the Chemours Company FC, LLC, DuPont de Nemours, Inc. (f/k/a DowDuPont Inc., herein "New DuPont"), and Qnity Electronics Inc.

[3] *See* Ex_8 (Trabucchi Declaration) ¶18 n.11 (citing Corteva, Inc., 2019 Form 10-K p. F-110).

undercapitalized company ("New Corteva")[4] without sufficient assets to cover those liabilities. Tellingly, Corteva's CEO and key board members plan to flee to Vylor.

The transaction will allow Corteva to intentionally bring itself to ultimate insolvency and will be a major obstacle to critical relief the People and many other legitimate creditors seek. To prevent that outcome, the People moved the district court on September 14 for leave to seek: (1) a temporary restraining order ("TRO") that would at a minimum restrain Corteva from effectuating the October 1 closing of the Vylor Spinoff, pending a preliminary injunction hearing; and (2) an asset-freezing preliminary injunction for the duration of the MDL covering at least Corteva's roughly $22 billion diminution in total assets immediately following the Vylor Spinoff. In support, the People submitted eight expert declarations and more than fifty exhibits.

On September 15, the district court denied leave to file the Proposed Motion. In a brief order with one sentence of reasoning and no legal citations, the court stated that "other venues clearly exist which are better suited to addressing such relief, namely those states in which the relevant parties are incorporated or headquartered." Ex_18 (order denying leave). The court's cursory decision and refusal to consider the merits of California's motion is unjustifiable, and flouts this Circuit's recent

[4] Corteva plans to keep its name post-Vylor Spinoff, but for clarity the post-separation company is referred to here as "New Corteva."

admonition to the very same district court that only extraordinary circumstances warrant denying leave for a motion.

California is entitled to its day in court, but time is short. The People thus request that this Court (1) maintain the status quo by enjoining the Vylor Spinoff pending appeal, and (2) summarily reverse the district court's denial of leave, with appropriate instructions to ensure California has an opportunity to be heard in the district court (and if necessary on appeal) on its preliminary injunction motion.[5]

## BACKGROUND

On November 17, 2022, the State of California brought this lawsuit in California state court seeking remedies for the DuPont Defendants' massive contamination of the State's waters, soil, and residents' bloodstreams with PFAS, including perfluorooctanoic acid ("PFOA"). The case was removed and transferred to the MDL, where the district court presides over many related cases. The People assert four equitable claims, among other causes of action. Three seek remedies for environmental harms, including public nuisance abatement. The fourth is a fraudulent-transfer claim that seeks imposition of a constructive trust.

[5] Corteva intends to oppose this motion.

## I. Dupont Defendants' PFAS Contamination Harms California's Public Health and Natural Resources.

Since at least the 1960s, Old DuPont developed detailed internal knowledge about the health hazards and environmental harms of PFOA—a chemical they used extensively to manufacture and sell their products. Ex_13 (Biehl Declaration in Support of Proposed Motion) ¶¶41–51 & 13.8–18, 13.25. Rather than warn the public or regulators, Old DuPont continued to knowingly and recklessly allow highly dangerous chemicals to contaminate California's lands and waters.

Today, more than 1,200 municipal drinking water sources in California have registered PFOA exceeding the federal maximum contaminant level ("MCL"), and nearly 22,000 domestic wells are projected to have elevated concentrations. Ex_9 (Fogg Declaration) ¶¶13(c)–(d). Populations across California have been exposed to PFAS and PFOA contamination, placing them at increased risk of kidney cancer, testicular cancer, ulcerative colitis, and low birth weight. Ex_7 (Steinmaus Declaration) ¶¶11, 37, 53, 59, 75. Implementing remedies to mitigate PFOA contamination through measures like treatment of wastewater and drinking water will cost tens of billions of dollars. Ex_10 (Najm Declaration) ¶11. Likewise, injuries to California's groundwater resources and public health costs will amount to further tens of billions to remedy. Ex_5 (Domanski Declaration) ¶11. Thousands of other claimants have brought similar claims against the same Defendants, some

of which already resulted in settlements totaling more than $4 billion. *See, e.g.*, Ex_13 ¶¶ 39, 78–83 & 13.6, 13.45–13.50.

**II. The DuPont Defendants' Ongoing Fraudulent Transfer Scheme.**

Knowing they faced massive liabilities, the DuPont Defendants in the mid-2010s initiated a restructuring that transferred assets, liabilities, and indemnifications—positioning their assets beyond the reach of creditors. Ex_12 (Armstrong Declaration) ¶¶15–18, 71–73, fig.5. Through one such restructuring in 2019, Old DuPont's temporary holding company (DowDuPont) spun off the newly incorporated Corteva into an independent, publicly traded company comprising Old DuPont's Agriculture (Crop Protection and Seed) business. Ex_12 ¶72 n.102. Corteva expressly assumed Old DuPont's liabilities through the spinoff, and Old DuPont is its wholly owned subsidiary. *Id.* ¶¶71–74.

The net effect of these efforts is to diminish access to the DuPont Defendants' assets and erode their capital structure, jeopardizing their ability to satisfy judgments arising from known PFAS liabilities. Ex_8 ¶35. Of note, since 2019 the DuPont Defendants have shed approximately $29 billion in combined distributions to shareholders via dividends and stock buybacks. Ex_12 ¶¶96–114, fig.6.

Recently, Corteva announced its intention to spin off its highly profitable Seed business (with assets originating from Old DuPont) into a new entity named Vylor, and isolate all PFAS liabilities into its waning Crop Protection business. Ex_8 ¶¶21–

27. If the transaction proceeds, Corteva will realize an immediate and material loss of assets and value that will further constrain the DuPont Defendants' capital structure and place at greater risk claimants' and the public's ability to redress decades of PFOA health and environmental impacts. *Id.* ¶¶11–39; Ex_12 ¶¶137–46.

For months, California conferred with counsel for Corteva about the upcoming transaction to seek a solution that would satisfy all parties, including discrete changes to the Vylor Spinoff that would mitigate the significant harm to all MDL plaintiffs and the public. Ex_17 (People's Reply in Support of Proposed Motion) at 2–3. But Corteva continuously delayed, declined to provide information requested by the People, and ultimately refused to make any changes. *Id.* Corteva has also kept key details of the Vylor Spinoff private, waiting until just last month to publish an amended SEC registration statements, which contains complex agreements underlying the transaction that California needed to evaluate the arrangement.[6] More amendments are anticipated.

[6] *See* Vylor Inc. Amendment 1 to Form 10, filed on August 14, 2026, https://www.sec.gov/Archives/edgar/data/2128626/000119312526352605/ctva_form_10-12ba.htm (archived at: https://perma.cc/ML5T-9NSZ).

## PROCEDURAL BACKGROUND

On September 14, 2026, California moved the MDL court for leave[7] to file its Proposed Motion for a temporary restraining order and preliminary injunction, requesting, inter alia, that the court maintain the status quo by restraining the planned closure of the Vylor Spinoff, and (after an evidentiary hearing) issuing an asset-freezing injunction for the duration of the MDL. The injunction would be narrowly tailored to avoid harm to Corteva's operations while preserving assets necessary to satisfy liabilities owed to California and other claimants. The People's motion—accompanied by meticulous declarations and expert reports describing the DuPont Defendants' fraudulent transactions, the extent of PFOA liabilities at stake, and the consequences of allowing the Vylor Spinoff to proceed—explained why California was likely to succeed on its equitable claims and why a TRO and asset-freeze was necessary to preserve the assets that would fund those claims. In support of the motion, eighteen states from across the political spectrum, the District of Columbia, the Commonwealth of Puerto Rico, and nine local governments—filed an affidavit supporting California's motion, *see* Ex_15.

---

[7] A motion for leave was required under Case Management Order No. 2.A., which requires a party to seek leave if, as here, Co-Lead Counsel declines to consent to a motion filing.

Corteva responded to California's motion for leave in a short opposition that focused mostly on merits defenses, Ex_16, and California replied, Ex_17. Untethered to any of Corteva's arguments for denying leave and without acknowledging the authorities in California's reply, the district court denied leave. Ex_18. In denying the Motion for Leave, the district court offered a single sentence explanation that "other venues clearly exist which are better suited to addressing such relief. . ." *Id.* at 1. The court did not explain why an MDL court exercising jurisdiction over the case and parties could or should decline to rule on a motion seeking critical emergency relief. Nor did it explain why the sovereign state of California—whose action was filed in and ultimately will be transferred back to a California court—should be compelled to litigate a new complaint in Delaware or Indiana, where Corteva is respectively incorporated and headquartered, to protect the relief it seeks in this action.

## JURISDICTION

This Court has jurisdiction to hear this appeal under its power to review "interlocutory orders of the district courts . . . refusing . . . injunctions." 28 U.S.C. §1292(a). As this Court recognized earlier this year in a decision arising from the same MDL before the same district court, a "denial of leave to file" a substantive motion amounts to a "refus[al]" of the relief requested in that motion. *In re Aqueous Film-Forming Foams Prods. Liability Litig.* ("*AFFF*"), 169 F.4th 436, 443 (4th Cir.

2026). Thus, where a statute authorizes appellate review of denial of an interlocutory motion, it also authorizes review of an order denying leave to file the motion. *Id.*

The Court here has jurisdiction because, akin to *AFFF*, the district court's denial of leave "prevented [California] from moving for, and thus from obtaining" a preliminary injunction. *Id.*; 28 U.S.C. §1292(a). In addition, the denial of leave prevented the State from obtaining a TRO to maintain the status quo—i.e., the pre-Spinoff state of affairs—needed for the preliminary injunction to achieve its intended aim, meaning the TRO denial also had the "practical effect" of denying an injunction. *Abbott v. Perez*, 585 U.S. 579, 595 (2018).

**STANDARD OF REVIEW**

This Court reviews a denial of leave to file a motion for abuse of discretion. *See Turner v. United States*, 736 F.3d 274, 283 (4th Cir. 2013); *AFFF*, 169 F.4th at 443–44. A district court abuses its discretion when its acts in "an arbitrary manner or relies on an erroneous principle of law." *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 710 F.3d 527, 533 (4th Cir. 2013). When a court prohibits the filing of a motion by relying on inappropriate criteria, it commits "legal error" that is "by definition an abuse of discretion." *AFFF*, 169 F.4th at 444.

The factors courts consider under Fed. R. App. P. 8 overlap with "the factors governing preliminary injunctions." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Court may grant injunctive relief where a party demonstrates: (1) a likelihood of

success on the merits, (2) a likelihood of irreparable injury absent the injunction, (3) that other parties will not be substantially harmed, and (4) that the injunction serves the public interest. *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970); *see also Nken* 556 U.S. at 434; *Alward v. Rokosky*, No. 25-6274, 2025 WL 1794425, at *1 (4th Cir. 2025) (per curiam). Courts "should pay particular regard for the public consequences," *Winter v. Nat. Res. Def. Council*, *Inc*., 555 U.S. 7, 24 (2008), and where "the public interest is involved" courts often "go much farther both to give and withhold relief in furtherance of the public interest than . . . when only private interests are involved," *United States v. Oncology Assocs.*, 198 F.3d 489, 495 (4th Cir. 1999) (quotation omitted).

This Court may grant summary reversal upon a showing that the issues on appeal are (1) manifestly unsubstantial and (2) appropriate for disposition by motion. 4th Cir. R. 27(f)(1). Summary reversal is appropriate to correct a demonstrably erroneous decision. *Strickland v. Moritz*, 149 F.4th 378, 405 (4th Cir. 2025).

## ARGUMENT

### I. This Court Should Grant an Injunction Pending Appeal to Preserve the Status Quo.

The Court should issue a temporary injunction pursuant to Fed. R. App. P. 8(a)(2) to maintain the status quo and prevent consummation of the Vylor Spinoff

during the pendency of this appeal.[8] Absent an injunction, the DuPont Defendants may place billions of dollars of assets beyond the reach of legitimate creditors[9] as a further step in what the People allege is an ongoing fraudulent scheme. Ex_12 ¶¶96–114; Ex_8 ¶¶14–17, 30–36, figs.1–3.

The People need expeditious relief to correct the district court's manifest error in refusing leave to file the Proposed Motion. An injunction pending appeal is necessary for the same reasons the court below should have issued temporary restraints and a subsequent injunction. The People are likely to prevail on their environmental and fraudulent transfer claims for equitable relief, which give California an equitable claim to the assets Defendants would transfer and shield from creditors. The People will suffer irreparable harm absent injunctive relief because consummating the Vylor Spinoff will move Corteva's most profitable business to Vylor while stranding Old DuPont's historic PFAS liabilities in New Corteva, which will in turn be undercapitalized and unable to satisfy judgments against it. The balance of equities favors the People because the substantial public interest in

---

[8] An injunction need only last until such time as the preliminary injunction motion is heard and resolved, plus such time as would allow the People to appeal any adverse decision before the transaction closes.

[9] Cal. Civ. Code §3439.04(a). A creditor need not have a judgment to have a claim. *Potter v. Alliance United Ins. Co.*, 250 Cal. Rptr. 3d 282, 294–95 (Cal. Ct. App. 2019). The People are creditors of Defendants through their PFAS claims.

preserving Old DuPont's assets to cover liabilities and the substantial risk of irreparable harm outweigh any potential financial impact to Corteva.

### A. California is Likely to Succeed on the Merits.

#### 1. The Court Manifestly Erred in Denying Critical and Time-Sensitive Injunctive Relief by Refusing Leave to File the Proposed Motion.

The district court, citing no authority, erred in denying leave to file for a reason that no party raised: that "other venues" would be "better suited to addressing" the motion. Ex_18 at 1. That ruling flouts this Court's recent admonition—to this same district court after a similar denial of leave to file a motion—that "[a]bsent extraordinary circumstances . . . a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." *AFFF*, 169 F.4th at 444–45 (cleaned up). In again denying leave, the district court's decision is so "demonstrably erroneous," *Strickland*, 149 F.4th at 405, as to warrant summary reversal. *See infra* §2.

The district court's stated justification is not a valid basis to deny leave. *See AFFF*, 169 F.4th at 444–45. In *sua sponte* raising a question of "venue," the district court fundamentally misconceived the operation of the MDL process, which creates "an artificial forum created for purposes of convenience and efficiency." *Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 133 (4th Cir. 2025) (citation omitted). MDL courts "are simply not encumbered by considerations of . . . venue." *Id.* (quoting *In*

*re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1379 (JPML 2020)). To the extent venue questions may arise "in the constituent cases" of an MDL proceeding, those questions become relevant only "*after* pretrial MDL proceedings conclude." *Id.* (emphasis added). More generally, there is no basis in logic or law to deny California's right to protect the equitable relief that it seeks *in this case* by bringing a motion in the MDL court hearing the case.

Even if the question of forum might be relevant to a specific motion in a correctly venued case, Corteva could not and did not argue that California should be compelled to bring its motion in an alternative venue. *See* Ex_16. Under a forum non conveniens framework, for example, a party can overcome the "deference" afforded a plaintiff's choice of venue only by "showing that the relevant public and private interests strongly favor a specific, adequate, and available alternative forum." *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 802 (4th Cir. 2013) (quotations omitted). The district court took no consideration of the adequacy of any alternative forum or the myriad public and private interests at play. *See, e.g.*, *DiFederico*, 714 F.3d at 806–808; *Tang*, 656 F.3d at 249, 252–53. Regardless, there is no legal basis to refuse to hear a particular *motion* on grounds of forum suitability, especially because the court is exercising jurisdiction over the case and over Corteva. *See* Ex_19 (order denying Corteva's motion to dismiss for lack of personal jurisdiction in MDL bellwether case).

### 2. California is Likely to Prevail on Its Claims, Which Vest It With an Equitable Interest in the Assets It Seeks to Freeze.

In addition to establishing a likelihood of success in reversing the district court's denial of leave, the State is likely to prevail on its equitable claims against Corteva, including the public nuisance and fraudulent transfer claims. Because those claims seek "cognizable relief in equity involving assets of the defendant," an asset-freezing injunction may issue "to preserve the status quo pending judgment" and ensure the availability of permanent relief. *Oncology Assocs.*, 198 F.3d at 496–97.

#### *a. Public Nuisance*

Under California law, a nuisance includes "[a]nything which is injurious to health," or is "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code §3479. A public nuisance is a nuisance that affects a "considerable number of persons," *id.* §3480, and "interfere[s] with[] the exercise of *rights common to the public*," *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 603 (Cal. 1997). A defendant is liable when its conduct forms a "substantial factor in causing the nuisance," meaning a "more than negligible or theoretical" cause. *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 543 (Ct. App. 2017) (emphasis and citation omitted).

As detailed in the People's briefing below, Old DuPont began researching PFOA's toxicity as early as the 1950s, developing a detailed understanding that PFOA presented major risks to human health and would spread widely to

contaminate water supplies, air, land, and other natural resources. *See* Ex_13 ¶¶41, 42–43, 46–52 & 13.8–13.10, 13.13–13.19. Old DuPont nevertheless affirmatively marketed its PFOA-containing products for uses it knew to be hazardous, becoming one of the world's largest PFOA manufacturers in the early 2000s while already being one of the largest industrial PFOA users. *See id*. ¶¶56–57 & 13.23–13.24.

California courts have found analogous conduct to constitute a substantial factor in causing a nuisance. *E.g.*, *ConAgra*, 227 Cal. Rptr. 3d at 529 ("affirmative promotion of lead paint for interior use" created public nuisance where defendants knew the hazards);[10] *Cnty. of Los Angeles v. Monsanto Co.*, 2019 WL 13064885, at *10 (C.D. Cal. Nov. 21, 2019) (affirmative promotion of PCBs while downplaying risks despite defendants' knowledge of toxicity created nuisance). As a result of the DuPont Defendants' deception, PFAS have contaminated nearly all tested Californians' blood and the State's drinking water sources, wildlife, water bodies, and soil. Ex_7 ¶¶11, 37, 53, 59, 73; Ex_9 ¶¶13(c)–(d). This widespread contamination, which occurred without the People's knowledge or consent, poses a "substantial and unreasonable interference with a public right." *ConAgra*, 227 Cal. Rptr. 3d at 525; *Monsanto*, 2019 WL 13064885, at *11.

---

[10] While *ConAgra* found liability based on the promotion of a hazardous use of a product, affirmative promotion for hazardous use is not a required element of nuisance liability, but merely one way to prove nuisance liability.

Irrespective of the DuPont Defendants' ongoing fraudulent transfer scheme described below, Corteva is liable for abating the nuisance Old DuPont created because Corteva expressly assumed Old DuPont's liabilities at issue in the MDL. Ex_12 ¶¶17, 73–74. Several courts have made this determination, including the North Carolina Supreme Court. *State ex rel. Stein v. E. I. du Pont de Nemours & Co.*, 879 S.E.2d 537, 546–47 (N.C. 2022) (rejecting argument that another entity assumed Old DuPont's "PFAS-related liabilities to the exclusion of all parties that would otherwise be liable" and holding that "Corteva [] expressly assumed" said liabilities).

*b. Fraudulent Transfer*

The People are also likely to prevail on their claim that the DuPont Defendants are engaged in a scheme of fraudulent transactions to shield their assets from PFAS liabilities. To prove a voidable transfer under a constructive fraud theory, a creditor must show: (1) the debtor did not receive "reasonably equivalent value" for the transfer; and (2) either the debtor's remaining assets were "unreasonably small in relation to" the transaction, or the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay." Cal. Civ. Code §3439.04(a)(2); *see also id.* §3439.05. To prove an actual fraud theory, the creditor must show the debtor had "actual intent to hinder, delay, or defraud any creditor." *Id.* §3439.04(a)(1), (b). Courts consider

circumstantial evidence to evince actual intent, focusing on "badges of fraud" enumerated in the statute. *In re Fox Ortega Enters.*, 631 B.R. 425, 445 (Bankr. N.D. Cal. 2021).

Extensive evidence demonstrates that the DuPont Defendants' ongoing conduct constitutes a constructive fraudulent transfer. The DuPont Defendants did not receive "reasonably equivalent value" for the transactions and knew and intended that they would incur debts beyond their ability to pay their PFAS liabilities. Cal. Civ. Code §3439.04(a)(2)(B); Ex_13 ¶16 & n.6. As explained in the briefing below, the DuPont Defendants took numerous steps between 2015 and 2019 to isolate and divest Old DuPont's assets from their PFAS liabilities. Ex_4 (Memo in Support of Proposed Motion) at 4–6. Through various reorganizations, Old DuPont transferred the majority of its non-PFAS assets to New DuPont and another new company, Dow, Inc. *See* Ex_12 ¶¶71–74. Corteva received Old DuPont's Seed and Crop Protection assets and holds Old DuPont as a wholly owned subsidiary. *Id.* ¶¶71–72 & n.102. Through these transactions, Old DuPont gave roughly half its assets to Corteva and New DuPont, for which it did not receive reasonably equivalent value. *See id.* ¶76.

There is ample evidence showing actual intent, demonstrating that Old DuPont created Corteva and entered various agreements in a years-long scheme designed to shelter valuable assets from creditors. The net result of the DuPont

Defendants' continuing scheme is a material diminution in assets, net worth, and enterprise value. Indeed, since the 2019 Corteva Spinoff, several DuPont Defendants, including New DuPont and Corteva, have shed nearly $29 billion to shareholders through dividend payments and stock buybacks. *Id.* ¶¶96–114; *see* Cal. Civ. Code §3439.04(b)(7) ("remov[ing] or conceal[ing] assets" indicates actual fraudulent intent).

The DuPont Defendants made these transactions "with the presence of numerous 'badges of fraud,'" which "support inferences that the transactions were made with actual intent to defraud." *See Fox Ortega*, 631 B.R. at 432. For instance, the DuPont Defendants faced thousands of lawsuits and mounting liabilities at the time of each transaction or agreement. Ex_13 ¶¶39, 78–83 & 13.6, 13.45–13.50; Ex_12 ¶¶34–48; Cal. Civ. Code §3439.04(b)(4) (debtor being "sued or threatened with suit" indicates actual fraudulent intent). DuPont Defendant insiders controlled each transaction, and the same is true for the upcoming Vylor Spinoff: Corteva's CEO and key board members are moving to Vylor, with Corteva controlling the entire transaction. Ex_12 ¶¶115, 117. Moreover, the lack of reasonably equivalent value exchanged at each step and Corteva's threatened insolvency double as badges of fraud. Cal. Civ. Code §3439.04(b)(8)–(9). The upcoming Vylor Spinoff reflects a culminating step in Defendants' fraudulent scheme that, as intended, would leave Corteva undercapitalized.

### B. California Will Suffer Irreparable Harm if the Injunction is Denied, and an Asset-Freezing Injunction Serves a Significant Public Interest.

If allowed to proceed, the Vylor Spinoff will immediately and irreparably harm the People and all MDL plaintiffs by eliminating a massive and critical source of potential relief. Ex_13 ¶¶11–32. Allowing Corteva to transfer its most valuable business to Vylor while stranding Old DuPont's PFAS and pension liabilities with its declining Crop Protection business in New Corteva will result in a destabilized New Corteva unable to satisfy PFAS judgments. Ex_8 ¶¶11–13, 22–26, 34; Ex_12 ¶¶124–136. Harm to California's public health and natural resources from PFAS is estimated to range between at least $88.3 and $166 billion. Ex_13 ¶17; *see generally* Exs_5,7,9,10. But the Spinoff will result in New Corteva fraudulently shedding approximately $22 billion in assets and an estimated 67% diminution in New Corteva's net worth, leaving New Corteva worth just $8.3 billion—less than one tenth of the bottom range of estimated harm to California alone. Ex_8 ¶24, fig.7.

Preserving Corteva's assets to remediate and abate the contamination DuPont Defendants have caused will benefit public health and the environment. *See Pioneer Hi-Bred Int'l, Inc. v. AltEn, LLC*, 2023 WL 1822724, at *24 (D. Neb. Feb. 8, 2023) (asset freeze served public interest by "preserv[ing] monetary assets that could be used to further remediation"); *Oncology Assocs.*, 198 F.3d at 499 (heightened public interest where money was diverted from government programs). The Court has

"enhanced authority" to issue an asset-freezing injunction that bars consummation of the Vylor Spinoff pending appeal because a significant "public interest is at stake." *Oncology Assocs.*, 198 F.3d at 497, 499. The People are harmed by widespread PFAS contamination that endangers the State's public health, environment, and natural resources. Preventing further fraud or misappropriation also serves the public interest.[11]

**C. The Equities Favor the People.**

Finally, the equities favor the People because any burden of an injunction pending appeal is outweighed by the substantial public interest and the immediate, irreparable harm the People will suffer absent this Court's intervention. The People do not seek to stop Corteva from conducting its ordinary business. This Court and other courts of appeal have, on similarly tight timelines, issued analogous orders under Rule 8(a) temporarily enjoining allegedly anticompetitive mergers pending appeals from orders denying preliminary injunctions. *See, e.g.*, *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976); *FTC v. Warner Comms. Inc.,* 742 F.2d 1156, 1159 (9th Cir. 1984); *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1076 (D.C. Cir. 1981). The Court has likewise upheld a preliminary injunction in parallel circumstances to prevent a liquidation of assets while litigation was pending, finding

[11] Without this Court's intervention New Corteva could follow in the footsteps of its predecessors by rapidly dissipating the Vylor cash dividend to shareholders post-spin. Ex_8 ¶¶33–36; Ex_12 ¶¶96–114, 124–36.

harm to the company speculative where it could proceed in the "regular course of business" and seek court approval of any extraordinary transactions. *U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1335 (4th Cir. 1989).

### D. Moving for an Injunction Pending Appeal in the District Court in the First Instance Would be Impracticable.

Under the exigent circumstances here, this Court can and should grant an injunction without further district court proceedings. Moving for an injunction pending appeal in the district court would be "impracticable" for at least two reasons. Fed. R. App. P. 8(a)(2)(A)(i). First, because the Vylor transaction will close on October 1, 2026 (with various preparatory steps undoubtedly occurring in the interim), the People and other creditors need immediate relief to prevent a fraudulent transfer of assets that could be difficult or impossible to unwind after the fact. Second, having denied the People leave to seek a preliminary injunction and TRO, there is no realistic prospect that the court would grant—or even grant leave to consider—a motion requesting a similar injunction, leaving this court facing the same issues but with even less time for decision.

## II. The Denial of Leave Should Be Summarily Reversed.

For the reasons explained above, *supra* §I.A.1, the district court's denial of leave and associated failure to substantively consider the State's preliminary injunction request was "demonstrably erroneous," *Strickland*, 149 F.4th at 405, and should be summarily reversed. Unless this Court grants summary reversal before

October 1, 2026, an injunction pending appeal is necessary to preserve the status quo. Should this Court grant summary reversal before that date, and thereby obviate the need for an injunction pending appeal, the Court should instruct the district court to maintain the status quo by immediately issuing a TRO (justified for all the reasons above) until it can consider the merits of California's preliminary injunction motion. In all events, this Court should protect California's right to seek appellate relief, by directing that the Vylor Spinoff cannot close until California has sufficient time to seek relief from this Court (which may choose to retain jurisdiction) from any potential adverse decision below.

## CONCLUSION

This Court should issue an injunction to maintain the status quo pending appeal and grant summary reversal with appropriate instructions to protect California's rights.

Respectfully Submitted,

**ROB BONTA**
**Attorney General of California**

*<u>/s/ Nicholas G. Campins</u>*
NICHOLAS G. CAMPINS (SBN 238022)
DIJE NDREU (SBN 251278)
BRENDAN HUGHES (SBN 333690)
Deputy Attorneys General
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General

DEBORAH M. SMITH (SBN 208960)
Senior Assistant Attorney General

California Department of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0801
Fax: (510) 622-2270
Email: Nicholas.Campins@doj.ca.gov
Dije.Ndreu@doj.ca.gov
Brendan.Hughes@doj.ca.gov
Deborah.Smith@doj.ca.gov

*Fourth Circuit Court Admissions forthcoming*

**SHER EDLING LLP**

*/s/ Stephanie D. Biehl*
STEPHANIE D. BIEHL
ASHLEY B. CAMPBELL
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Telephone: (628) 231-2500
Facsimile: (628) 231-2929
Email: stephanie@sheredling.com
ashley@sheredling.com

*Attorneys for the People of the State of California, ex rel. Rob Bonta, Attorney General of California*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because it contains 5,190 words, excluding the portions exempted by the rules. The motion's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

Dated: September 18, 2026

*/s/ Stephanie D. Biehl*
Stephanie D. Biehl

**CERTIFICATE OF SERVICE**

I certify that on September 18, 2026, I served the foregoing motion on counsel by CM/ECF. Counsel for Defendant-Appellee are all registered ECF users and will be served by the ECF system.

Dated: September 18, 2026

*/s/ Stephanie D. Biehl*
Stephanie D. Biehl